UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CHRISTOPHER P. MARTIN, | : | CIVIL ACTION NO. 03-6116 (MLC) |
|  | : |  |
| Plaintiff, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| BLASER SWISSLUBE, INC., | : |  |
| et al., | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

**COOPER, District Judge**

Defendants, Fuchs Lubricants Co. ("Fuchs"), and  Blaser Swisslube, Inc. ("Blaser"), move separately pursuant to Federal Rule of Civil Procedure ("Rule") 56(c) for summary judgment as to the claims asserted against them for products liability.  (Dkt. entry nos. 13 & 20.)  The Court, for the reasons stated herein, will grant the motion by Fuchs and deny the motion by Blaser.

**BACKGROUND**

Plaintiff, Christopher P. Martin ("Martin"), worked as a machinist for various companies from 1986 through 2001, except for a two-year period between 1996 and 1998.  (Pl. Br., at 6.) He operated machines that cut and fabricate useable parts from raw metals.  (Fuchs Br., at 2.)  The machines spin rapidly and create friction while in use.  (Pl. Br., at 5.)  Metalworking fluids or cutting fluids/oils ("fluid") mixed with water are sprayed onto the machines to cool and lubricate the metal while

it is being cut.  (Id.)  The fluid mixes with dust and metal shavings that are created by the cutting.  (Id.)  Upon contact with the metal, the fluid and particle mixture turns to a mist as a result of the heat.  (Id. at 5-6.)  Martin inhaled this mist. (Id. at 6.)  His clothing absorbed the dust and his skin was exposed to it.  (Id.)

Blaser and Fuchs produce metalworking fluid.  (Id. at 5.) Blaser produces Blasocut 2000 Universal, and Blasocut 4000 Strong (collectively "Blasocut").  (Id.)  Fuchs produces Renokool PT-85 Blue ("Renokool").  (Fuchs Br., at 4.)

Martin was diagnosed with adenocarcinoma of the distal esophagus in November 2001.  (Pl. Br., at 7.)  He underwent chemotherapy and radiation, and had parts of his esophagus and stomach removed.  (Id.)  Martin brought an action against the defendants in the Superior Court of New Jersey on November 7, 2003, alleging that his exposure to, and inhalation of, their products caused his cancer.  (Id.)  He claims that the defendants are strictly liable to him because they placed defective products into the stream of commerce, without an adequate warning as to the health risks associated with the fluid.  (Compl., at 3.)

Fuchs removed the action to this Court on December 24, 2003. (Dkt. entry no. 1.)  Jurisdiction is proper pursuant to 28 U.S.C. § 1332.  Fuchs and Blaser now seek summary judgment as to the claims asserted against them.

2

**DISCUSSION**

Fuchs argues that it is entitled to summary judgment because (1) Martin has not demonstrated that he was exposed to a Fuchs product in particular, and (2) Martin's expert reports are inadmissible and cannot be considered. (Fuchs Br., at 14, 19.) Blaser, adopting the arguments of Fuchs as set out in Fuchs's brief, argues that Martin has not shown that he was exposed to a Blaser product. (Blaser Br., at 4.) Martin argues that summary judgment is not appropriate because (1) the defendants (a) placed defective products into the stream of commerce, and (b) did not place adequate warnings labels on their products, (2) his exposure and other facts create an inference that the defendants' fluids caused his cancer, and (3) the experts' reports are admissible. (Pl. Br., at 9, 10, 12, 15.) The Court heard oral argument on November 14, 2005. (Dkt. entry no. 23.)

**I. Standard for Summary Judgment**

Rule 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the summary

3

judgment movant has met this prima facie burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  A nonmovant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the nonmovant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. at 247-48 (emphasis in original).  A fact is material only if it might affect the action's outcome under governing law.  Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

4

**II. Elements of a Products Liability Action**

"Under strict products liability a manufacturer has a duty to ensure that the products it places into the stream of commerce are safe when used for their intended purposes." <u>Zaza v. Marquess and Nell, Inc.</u>, 675 A.2d 620, 627 (N.J. 1996).  To recover in a products liability action, a plaintiff must prove that the product (1) was defective, (2) when it left the defendant's control, and (3) caused injury to a reasonably foreseeable user.  <u>Id.</u>[1]  "Defects are classified as design defects, manufacturing defects, or inadequate warning defects." <u>Id.</u> at 628.  In an inadequate warning case, the defect is not a structural flaw in the product itself, but rather a failure to provide notice to potential users that the product could cause injury.  <u>Coffman v. Keene Corp.</u>, 628 A.2d 710, 716 (N.J. 1993).

Two types of causation must be established to prevail in a products liability action: product-defect causation, and medical causation.  <u>Id.</u>; <u>see also</u> <u>Becker v. Baron Bros. Coliseum Auto Parts, Inc.</u>, 649 A.2d 613, 616 (N.J. 1994).  Product-defect causation requires the plaintiff to prove that the defect in the product was the proximate cause of the injury.  <u>Id.</u>  Medical

---

[1] The Court applies New Jersey products liability law because this action is based on diversity jurisdiction. <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64, 78 (1938); <u>Pipon v. Burroughs-Wellcome Co.</u>, 532 F.Supp. 637, 637 (D.N.J. 1982) (noting that the district court sits as if it is the Superior Court of New Jersey with respect to substantive law in diversity cases).

causation requires the plaintiff to prove that the injury was proximately caused by exposure to the defendant's product.  James v. Bessemer Processing Co., Inc., 714 A.2d 898, 908 (N.J. 1998). When a plaintiff has been exposed to multiple products of multiple defendants, a "plaintiff must show that the exposure [to each defendant's product] was a substantial factor in causing or exacerbating the disease." Id. at 908-09 (internal quotes and citations omitted); see also Becker, 649 A.2d at 620 (adopting a product-by-product approach to assessing causation instead of a categorical approach); Sholtis v. Am. Cyanamid Co., 568 A.2d 1196, 1203 (N.J. App. Div. 1989) ("the contact between the plaintiff and the defective product must be sufficiently significant so that a reasonable jury could determine the product was a substantial factor in bringing about the plaintiff's injury").

To determine whether a specific defendant's product was a substantial or exacerbating factor, a plaintiff must prove "exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." Lohrmann v. Pitt. Corning Corp., 782 F.2d 1156, 1162-63 (4th Cir. 1986); see also James, 714 A.2d at 910 (setting out "frequency, regularity, and proximity" test as adopted in Sholtis).  References to a defendant's market share or industry market percentages are insufficient to reconstruct

6

liability in an action where specific tortfeasors are known and identified.  Sholtis, 568 A.2d at 1205; see also James, 714 A.2d at 910 (noting that "frequency, regularity, and proximity" test does not apply to actions that proceed on a theory of collective liability where the specific tortfeasor cannot be named).  Allegations or proof that defendant's product was at the workplace are insufficient to prove exposure to the product or demonstrate proximate cause.  Lohrmann, 782 F.2d at 1162; Wilkerson v. Armstrong, No. 89-2494, 1990 WL 138586, at *3 (D.N.J. 1990) (noting that speculation that a product was used in the workplace did not establish a material fact to base a denial of summary judgment).  The plaintiff's contact with the product must be "proven or reasonably approximated by inference." Sholtis, 568 A.2d at 1205, 1207.

**III. Martin's Exposure to Defendants' Products**

Martin has brought this action against two specific producers of fluid, in addition to an unnamed manufacturer.  Pursuant to James, the Court will evaluate the frequency, regularity, and proximity of Martin's exposure to each product

7

individually.[2]  Martin has not alleged sufficient exposure to Renokool to maintain an action against Fuchs.  Martin, however, has adequately alleged exposure to Blasocut to maintain an action against Blaser.[3]

**A. Exposure to Fuchs's Renokool**

Martin asserts that "he is certain that he was exposed to . . . Renokool PT 85-Blue as early as 1986." (Pl. Br., at 6; 6-14-02, <u>Martin v. Mid-Atlantic CNC</u>, Workers' Compensation Tr., No. 2002-2848, at 11-12.)  He, however, cites no references, documents, affidavits, etc. to support his assertion.  Both the complaint, and Martin's brief in opposition to summary judgment collectively refer to "the defendants" and make no reference to specific instances of exposure, or individual products and their manufacturers.  Martin relies on his own recollection.  His assertions are speculative in nature and without substantiation.  For example, Martin has not provided any information or documents from Fuchs or any of his employers to verify or prove, the

_____

[2] For the purposes of this opinion, the Court will evaluate medical causation only.  The Court makes no determination as to the other elements of a products liability claim - (1) whether there was a defect when the product left the defendant's control, and (2) product-defect causation - because the Court finds that Martin has not sufficiently alleged exposure to a Fuchs product to maintain the action against Fuchs, and has adequately alleged exposure to a Blaser product to maintain an action against Blaser at this stage.

[3] In the testimony that will be cited <u>infra</u>, Martin uses the terms Blaser, Blazer, Blazocut, Swiss, and Swisslube, interchangeably to refer to fluid manufactured by Blaser.

employers bought Renokool, the quantities of Renokool bought, the frequency with which Renokool was used in the employers' machines, etc.  Such an unsupported recollection is not enough to establish frequent, regular, and proximate contact necessary to demonstrate causation.

Martin worked as a machinist for five different companies over the course of almost twenty years: Stone Construction, Inc. ("Stone") from 1987-1991, Hauser, Inc. ("Hauser") from 1991-1994, Parlec, Inc. ("Parlec") from 1993-1995, RTM Ravensburg ("RTM") from 1995-1996, and Mid-Atlantic CNC ("Mid-Atlantic") October 1998 to November 2001.  (Fuchs Br., at 3.)  Martin does not recall Fuchs fluid being used at Hauser, Parlec, or RTM.  Martin only recalls Fuchs being present at Stone and Mid-Atlantic.  As to Hauser, Martin testified in his deposition that:

> Martin: I would see occasionally a 55 gallon drum with Blaser on it.  Other than that I wasn't privy to any other. . .
> Q: So you don't have any knowledge that you can testify about today with respect to Fuchs Lubricant being used at Hauser?
> Martin: Not in Hauser, no.

(8-19-04 Martin Dep., at 68-69.)  When asked about his use of Fuchs products at Parlec, Martin stated:

> Q: What types of cutting oils did you use at Parlec?
> Martin: I was not privy to it. . .
> Q: Other than seeing a couple of empty 55 gallon drums with the name Blaser on it, do you have any

recollection of seeing any other manufacturers of
cutting oils at Parlec?
        Martin: No, I do not.

(Id. at 82-83.)  As to RTM, Martin testified:

        Q: Do you recall the names of any of the
manufacturers of cutting oils that you used at RTM?
        Martin: I remember seeing a 55 gallon drum for
Swiss. . .
        Q: You have one recollection of seeing one 55
gallon drum of Swiss?
        Martin: . . . I remember seeing a 55 gallon drum
both full and empty of Blaser Cut.  I don't remember
seeing any others.

(Id. at 87-88.)

        Fuchs products were present at both Stone and Mid-Atlantic
according to Martin.  Mere presence, however, is not enough to
satisfy the proximity, frequency, and regularity of his exposure
to Fuchs's product in particular.[4]

        Martin indicates that, at Stone, Blaser Cut Swisslube is the
cutting oil that sticks out in his mind.  (8-19-04, Martin Dep.,
at 35.)  He recalls seeing a pail of Fuchs, but cannot remember
whether it was a five or fifty-five gallon pail.  (Id. at 39.)
He also has a recollection of taking a container of Fuchs to the
machines, however "I don't think I did it everyday that I was
there.  I am sure throughout the course of the three years that I

---

        [4] Martin must specifically identify his exposure to Renokool
because he has identified Fuchs as a defendant, and is not
proceeding under a theory of collective or market-share
liability.

was there I had occasion to do it once a month, if not more

often." (Id. at 46.)  Additionally, Martin stated:

> I am certain that I put the coolants in the machine.  I
> am certain that the machine at that point produced a
> mist and some dust.  I don't have a specific
> recollection of a day, date, or time that I put Fuchs
> cutting oil in the machine and then pressed the start
> button and remember seeing Fuchs cutting oil coming out
> of the machine. . .

(Id. at 54-55.)  Contrary to his deposition testimony, Martin

makes no mention of Renokool being used at Stone in his workers'

compensation hearing.  He indicates Swiss Lube and Blazer Swiss

were used at Stone.  (6-14-02, Martin v. Mid-Atlantic CNC,

Workers' Compensation Tr., No. 2002-2848, at 62.)

Martin recalls seeing a five gallon drum of Renokool at Mid-

Atlantic, but cannot verify that the Renokool was ever used or

placed in the machines. (8-19-04, Martin Dep., at 110-114.)[5]

> Q: Would it be fair to say over the course of your
> employment with Mid-Atlantic, CNC you have no specific

---

[5] It should be noted that this deposition testimony
conflicts with both Martin's testimony at the workers'
compensation hearing, and answers to interrogatories. At the
compensation hearing Martin was asked, "All right.  So far as
you're concerned, during your entire tenure with [Mid-Atlantic]
CNC, the only oil that was used at CNC was the Swiss Lube?"  And
Martin replied, "Yes".  "You know of no other," and Martin
responded, "No."  (6-14-02, Martin v. Mid-Atlantic CNC, Workers'
Compensation Tr., No. 2002-2848, at 40.).  In his responses to
interrogatories, Martin said he saw a fifty-five gallon drum at
Mid-Atlantic, not a five gallon drum as he testified at
deposition.  (Fuchs Ex. C, at 17.)   The Court, however, must
view the facts in the light most favorable to Martin and will
rely on Martin's deposition testimony.

> recollection of operating a machine at Mid-Atlantic and
> using a Fuchs Lubricant product?
>     Martin: Like I said, there would be no way for me
> to know what type of coolant was in the machine.  My
> only certainty that I did was because that's what was
> there.  I didn't put Fuchs Coolant in the machine to
> know that that was in the machine when I was operating
> it.  So there would be really no way for me to know for
> certain if I was using Fuchs or Swiss.

(Id. at 109.)

In response to interrogatories in which he was asked to
identify the places of his exposure to a Fuchs product, Martin
indicated he was exposed while working for Mid-Atlantic, but did
not have a "specific recollection with regard to the previous
employers, of seeing containers with the Renokool label." (Fuchs
Ex. C., at 17.)  Martin himself in his brief summarizes his
answers to interrogatories, and the testimony given at his
deposition and workers' compensation hearing as showing that he
was exposed "occasionally to the products manufactured by Fuchs,"
and "regularly to Blazocut."  (Pl. Br., at 16. (emphasis added).)

Martin's recollection of Fuchs's products at the various
companies conflict, and his exposure is sporadic at best, and
without verification.  The Court, considering both the quality of
the evidence Martin has presented, and the absence of evidence,
finds that Martin has not raised a triable issue of fact as to
his consistent exposure to a Fuchs product in response to Fuchs's
prima facie showing of entitlement to relief.  Nat'l State Bank
v. Fed. Reserve Bank of N.Y., 979 F.2d 1579, 1582 (3d Cir. 1992)

(if the party moving for summary judgment does not bear the burden on the underlying claim, it can point to the lack of evidence supporting the non movant's claims).

### B. Exposure to Blaser's Blasocut

Martin alleges that "Blazocut metalworking fluids were the most prevalent ones he worked with during the course of his employment as a machinist." (Pl. Br., at 6.)  Unlike his assertions as to Fuchs, Martin indicates that Blaser's products were used at all five companies for which he worked.  When asked what fluid he used while employed by Stone, Martin said: "[t]he one that sticks out in my mind is Blaser Cut Swisslube." (8-19-04, Martin Dep., at 35.)  "I think Blaser Cut had the bulk of the work"  (Id. at 39.)  "Usually the coolants I was dealing with was Blaser Cut"  (Id. at 46).  Specifically, as to the frequency of the use of Blaser at Stone, Martin stated:

> Q: Do you have specific recollection of using
> Blaser Swisslube in 55 gallon drums while at Stone
> Construction?
> Martin: Absolutely, yes.
> Q: How many times?
> Martin: I would say average of twice a week.

(Id. at 53.)  Martin also recalls using Blaser products at Hauser.  He stated:

> Q: Is there any particular occasion that you
> recall where you actually observed someone putting a
> cutting oil into a machine that you operated that you
> can identify by product name?
> Martin: Product name and -- yes, a 55 gallon drum,
> half blue, half white was Blaser Swisslube Cut. . . .

13

Blaser is the big-is the big name that I always would
see everywhere along with other cutting oils.  Blaser
was consistent.

(Id. at 68-69.)[6]

Martin, in both his deposition and workers' compensation
hearing, indicated, as to Parlec, the primary coolant used was
Blaser's.  "I remember seeing some empty 55 gallon drums of
Blaser.  I don't remember seeing the full 55 gallon drums.  I
assumed they used Blaser.  Most places did." (Id. at 82.)
"I believe they [Parlec] used Blazer Swiss Lube as well.  It's
the prevalent coolant in the industry." (6-14-02, Martin v. Mid-
Atlantic CNC, Workers' Compensation Tr., No. 2002-2848, at 57.)

Martin remembers seeing 55 gallon drums of Swiss on a daily
basis while working at RTM.  He walked by the drums daily to get
to the machine on which he worked.  (8-19-04 Martin Dep., at 88.)
He recalls seeing both full and empty drums.  (Id.)

When asked about what fluids were used at Mid-Atlantic,
Martin stated "I would see Blaser Swisslube Blaser Cut, all
over."  (Id. at 106.)  As far as Martin was concerned the only

---

[6] Martin's deposition testimony is consistent with his
testimony during a workers' compensation hearing where he
indicated Blazer Swiss Lube was used at Stone and Hauser.  (6-14-
02, Martin v. Mid-Atlantic CNC, Workers' Compensation Tr., No.
2002-2848, at 62, 69.)

fluid used at Mid-Atlantic was Swiss Lube.  (6-14-02, <u>Martin v.
Mid-Atlantic CNC</u>, Workers' Compensation Tr., No. 2002-2848, at
40.)

Blaser bears the initial burden of showing that there is no
genuine issue of material fact.  It, however, has not directly
confronted Martin's assertions against it.  Blaser only indicates
that it is going to contest that (1) Martin worked at Stone,
Hauser, and Parlec, and (2) Stone used Blaser products.  (Blaser
Br., at 2.)  Blaser makes no argument, and points to no evidence
to demonstrate Martin's lack of exposure to Blaser products
specifically.  Unlike the situation with Fuchs, there is no
absence of evidence to consider either because Martin
consistently implicates Blaser in his deposition and workers'
compensation hearing.

As the defendants in <u>James</u> and <u>Lohrmann</u>, Blaser has been
specifically identified as a potential tortfeasor and cannot rely
on generalizations about Martin's lack of exposure overall, or
his lack of exposure to another company's fluid.  Blaser adopts
the Fuchs brief.  The Fuchs brief only addresses Martin's lack of
exposure to a Fuchs product, and acknowledges that Martin states
that he was exposed to Swiss Lube.  (Fuchs Br., at 4-5.)

Martin's repeated and consistent assertions that he saw both
empty and full drums of Blaser products at all his places of
employment raise a reasonable inference that the fluid to which

15

Martin was exposed when working on the machines was Blaser fluid. Several of Martin's statements as noted above reflect the idea that Blaser fluid is the primary coolant in the industry or "the big one". While these assertions are not verified, Martin worked in the industry for fifteen years at various places, and could gain a sense of what coolant was most common. The general awareness of Blaser fluid's use in the industry, in conjunction with Martin's recollection of specific instances of seeing and using Blaser fluid, raise a genuine issue of material fact as to his exposure to Blaser's products and summary judgment as to Blaser is inappropriate.[7]

## IV. Admissibility of Martin's Expert Reports

Fuchs argues that Martin's expert reports cannot be considered for purposes of this motion because they are neither reliable nor relevant. (Fuchs Br., at 19.) Martin argues the reports are relevant because they relate exposure to metalworking fluids and the development of esophogeal cancer. (Pl. Br., at 16.)

"The trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but

---

[7] The Court makes no determination here as to whether there is sufficient prima facie evidence that Blaser's product was defective or the proximate cause of Martin's injury. Martin's exposure to Blaser fluid raises a genuine issue of material fact on the issue of sufficient exposure to the product, and it alone requires the Court to deny this summary judgment motion.

reliable." <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579,
589 (1993).  It is the role of the trial judge to act as
gatekeeper.  <u>Daubert</u>, 509 U.S. at 597; <u>Kannakeril v. Terminix</u>
<u>Int'l, Inc.</u>, 128 F.3d 802, 806 (3d Cir. 1997).  To be admissible
as expert testimony, (1) the proffered witness must be an expert,
(2) the expert must testify about matters requiring scientific,
technical, or specialized knowledge, and (3) the testimony must
assist the trier of fact.  <u>Kannakeril</u>, 128 F.3d at 806; <u>see also</u>
Fed. R. Evid. 702.  A <u>Daubert</u> hearing may be held when there is
an objection to the admission of expert testimony.  The decision
to hold a <u>Daubert</u> hearing rests in the sound discretion of the
district court.  <u>Padillas v. Stork-Gamco, Inc.</u>, 186 F.3d 412, 418
(3d Cir. 1999).  A motion for summary judgment should be denied
without prejudice pending the outcome of a <u>Daubert</u> hearing, when
disposition of the motion depends on a determination of the
admissibility of expert testimony.  <u>Connectel, LLC v. ITXC, Inc.</u>,
No. 00-2627, 2004 WL 540444, at *6 (E.D. Pa. 2004).

      The Court here makes no determination as to the
admissibility of Martin's expert reports.  Disposition of the
motions for summary judgment by Fuchs and Blaser neither relies
nor depends on the expert reports.  The action is not yet ripe
for a decision as to the admissibility of the reports.  To the
extent that Fuchs's and Blaser's challenges to Martin's expert

reports can be considered a motion for a <u>Daubert</u> hearing, the motion is denied without prejudice.

**<u>CONLUSION</u>**

The Court, for the reasons stated <u>supra</u>, will grant the motion for summary judgment by Fuchs, and deny the motion for summary judgment by Blaser.  An appropriate order and judgment will be issued.

<u>   s/ Mary L. Cooper   </u><br>
**MARY L. COOPER**<br>
United States District Judge